**No. 26-10312**

# In the United States Court of Appeals for the Eleventh Circuit

SAFE AFFORDABLE GEORGIA, INC.,

*Plaintiff-Appellant,*

v.

CHAIRMAN OF THE STATE ETHICS COMMISSION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:25-cv-06985 (Ross, J.)

**Brief of State of Georgia Defendants-Appellees**

David B. Dove
Elizabeth Hicks
Alexander Balser
Rachel D. Hendrix

TROUTMAN PEPPER LOCKE, LLP
600 Peachtree Street NE, Suite 3000
Atlanta, GA 30308
(404) 885-3000
david.dove@troutman.com
elizabeth.hicks@troutman.com
alex.balser@troutman.com
rachel.hendrix@troutman.com

*Counsel for State of Georgia Defendants-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

### No. 26-10312, *Safe Affordable Georgia, Inc. v Chairman of the State Ethics Commission, et al.*

The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case.

1. Anulewicz, Christoper S.
2. Balser, Alexander
3. Bradley Arrant Boult Cummings LLP
4. Burge, David, in his official capacity as member of the State Ethics Commission
5. Carr, Christopher M., in his official capacity as Attorney General of Georgia
6. Diment, Dana, in her official capacity as member of the State Ethics Commission
7. Dove, David B.
8. Georgia Attorney General's Office
9. Hendrix, Rachel D.
10. Hicks, Elizabeth
11. Institute for Free Speech
12. Kreyenbuhl, James D., in his official capacity as Chair of the State Ethics Commission
13. Miller, Charles
14. Ross, Eleanor L., Hon.
15. Safe Affordable Georgia, Inc.

16. State Ethics Commission

17. Thompson, Rick, in his official capacity as Vice Chairman of the State Ethics Commission

18. Troutman Pepper Locke, LLP

19. Wise, Stan, in his official capacity as member of the State Ethics Commission

April 2, 2026

/s/ *David B. Dove*
David B. Dove
Georgia Bar No. 998664

*Counsel for State of Georgia Defendants-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not request oral argument in this case. The legal issues before the Court in this appeal are straightforward and adequately presented in the briefs. Further, the issues are identical to those presented in the briefing for Safe Affordable Georgia's motion for injunctive relief pending appeal, which this Court denied without oral argument. Accordingly, oral argument would not significantly aid the decision-making process.

# TABLE OF CONTENTS


Statement Regarding Oral Argument ..... i

Table of Contents ..... ii

Table of Authorities ..... iv

Introduction ..... 1

Statement of Issues ..... 3

Statement of the Case ..... 3

A. Georgia's campaign-finance laws. ..... 3

B. The present litigation. ..... 7

C. Standard of review ..... 9

Summary of Argument ..... 10

Argument ..... 12

I. SAGA has not established a substantial likelihood of success on the merits of its First Amendment claim. ..... 13

A. Contribution and coordination limits are subject to intermediate scrutiny and must be closely drawn to serve the State's compelling anticorruption interests. ..... 13

B. SAGA fails to assert a meritorious First Amendment claim. ..... 16

C. SAGA's arguments to the contrary are unavailing. ..... 19

1. SAGA incorrectly focuses on the scope of relief it sought below while ignoring the mismatch between the purpose of an injunction and the sweeping relief it requested ..... 21

2. SAGA attempts to recast its argument as a challenge to the leadership committee statute, but that argument is waived. ..... 25

3. The case law SAGA relies on does not help it. ..... 27

II. SAGA has not shown a substantial risk of irreparable harm. ....................29

III. SAGA's requested relief would harm the public interest by creating the appearance of corruption. ....................32

Conclusion ....................35

Certificate of Compliance ....................36

Certificate of Service ....................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Now, Inc. v. Sw. Airlines Co.*,
385 F.3d 1324 (11th Cir. 2004) ........ 25

*BellSouth TeleComms v. MCIMetro Access Transmission Servs., LLC,*
425 F.3d 964 (11th 2005) ........ 10

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........ *passim*

*Carr v. WBJ Leadership Committee, Inc.*,
No. 1:25-cv-04426 (N.D.Ga. Aug. 28, 2025) ........ 22, 23

*Charles v. Burton*,
169 F.3d 1322 (11th Cir. 1999) ........ 29

*Clark v. Sweeney*,
607 U.S. 7 (2025) ........ 26

*Collegiate Licensing Co. v. Am. Cas. Co. of Reading, Pa.*,
713 F.3d 71 (11th Cir. 2013) ........ 10

*Cotton States Mut. Ins. Co. v. Anderson*,
749 F.2d 663 (11th Cir. 1984) ........ 28

*Cunningham v. Adams*,
808 F.2d 815 (11th Cir. 1987) ........ 30

*Davis v. Federal Election Commission*,
554 U.S. 724 (2008) ........ 27

*FEC v. Nat'l Conservative PAC*,
470 U.S. 480 (1985) ........ 14, 30

*Fed. Elec. Comm'n v. Colo. Repub. Fed. Campaign Comm'n*,
533 U.S. 431 (2001) ........ *passim*

*Fla. Preborn Rescue, Inc., v. City of Clearwater*,
161 F.4th 732 (11th Cir. 2025) .......... 30

*Jackson v. Jones*,
No. 1:26-cv-00782 (N.D. Ga. Feb. 25, 2026) .......... 23, 24, 33

*KH Outdoor, LLC, v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) .......... 30

*Lomax v. Oritz*,
590 U.S. – (2020) .......... 26

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
896 F.2d 1283 (11th Cir. 1990) .......... 30

*Nixon v. Shrink Mo. Gov't PAC*,
528 U.S. 377 (2000) .......... 14

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 9

*One Georgia, Inc. v. Carr*,
699 F.Supp.3d 1291, 1336 (N.D.Ga. 2022) .......... 21

*Perdue v. Kemp*,
584 F. Supp. 3d 1310 (N.D.Ga. 2022) .......... 20

*Proft v. Raoul*,
944 F.3d 686 (7th Cir. 2019) .......... *passim*

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 32

*Riddle v. Hickenlooper*,
742 F.3d 922 (10th Cir. 2014) .......... 27

*Schiavo ex rel. Schindler v. Schiavo*,
403 F.3d 1223 (11th Cir. 2005) .......... 28

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) (en banc) .......... 9, 29, 30, 32

*Trump v. Casa*,
606 U.S. 831 (2025) .......... 22

*Upstate Jobs Party v. Kokinski*,
106 F.4th 232 (2d Cir. 2024). .......... 15, 16, 27

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) .......... 26

*Wreal, LLC v. Amazon.com, Inc.*,
840 F.3d 1244 (11th Cir. 2016) .......... 9

*Wright v. Hanna Steel Corp.*,
270 F.3d 1336 (11th Cir.2001) .......... 25

**Statutes**

U.S. CONST. amend. I .......... *passim*

Government Transparency and Campaign Finance Act,
O.C.G.A. §§ 21-5-1, *et seq.* .......... 3, 6

O.C.G.A. § 21-5-3 .......... 4, 6, 7

O.C.G.A. § 21-5-30 .......... 5, 7, 17, 19

O.C.G.A. § 21-5-30.1 .......... 19

O.C.G.A. § 21-5-34 .......... 4, 5, 6, 7

O.C.G.A. § 21-5-34.2 .......... *passim*

O.C.G.A. § 21-5-41 .......... *passim*

O.C.G.A. § 43-1-2 .......... 19

O.C.G.A. § 43-4A-5 .......... 19

O.C.G.A. § 43-20A-4 .......... 19

O.C.G.A. § 43-46A-2 .......... 19

## Other Authorities

Ga. Comp. R. & Regs, R. 189-6-.04 (2015) ........................................... 4

State Ethics Comm'n, Advisory Op. No. 2015-02 (June 17, 2015)........................................................................... 5, 6

## INTRODUCTION

This appeal is Plaintiff Safe Affordable Georgia, Inc.'s ("SAGA's") third attempt to obtain extraordinary injunctive relief on the same theory. SAGA first asked the district court for a preliminary injunction and was denied. It then sought an injunction pending appeal from this Court and was denied again. Nothing in SAGA's opening brief changes the legal landscape or the record that underpinned those rulings. Repackaging the same arguments in yet another procedural posture does not make them any more persuasive, and this Court should affirm for the same basic reasons that both courts have already refused to grant relief.

SAGA's insistence that it should now prevail on appeal falters at the threshold because it never meaningfully engages with the governing standard of review. This Court reviews the denial of a preliminary injunction for abuse of discretion, which means the judgment must be affirmed even if the appellate panel might have weighed the factors differently in the first instance. It is SAGA's burden to show that the district court applied the wrong legal standard, made clearly erroneous factual findings, or committed a clear error of judgment—most critically, in concluding that SAGA failed to establish a substantial likelihood of

success on the merits. SAGA does not make that showing. Instead, it erroneously asserts that the district court "found" a First Amendment violation simply because the court, in passing and without undertaking its own merits analysis, noted that the leadership committee statute, Code Section 21-5-34.2, has previously been described as "likely unconstitutional" elsewhere. From that premise, SAGA leaps to the conclusion that a constitutional injury is so obvious and certain that this Court need not seriously scrutinize the merits or the scope of the requested remedy.

That is not how abuse of discretion review works, and it is not the law governing preliminary injunctions. When the district court's reasoning is examined under the proper standard, it is clear that SAGA has not demonstrated a substantial likelihood of success on its First Amendment claim, has not established irreparable harm, and has not shown that the balance of equities or the public interest favors an injunction. Accordingly, the order denying preliminary relief should be affirmed.

## STATEMENT OF ISSUES

1. Whether the district court abused its discretion by holding that SAGA was not entitled to a preliminary injunction for failure to show a substantial likelihood of success on the merits.

## STATEMENT OF THE CASE

### A. Georgia's campaign finance laws.

Georgia's Government Transparency and Campaign Finance Act ("Act"), O.C.G.A. §§ 21-5-1 *et seq.*, limits contributions to statewide candidates to $8,400 for a primary, $8,400 for a general, and $4,800 for a runoff, adjusted for inflation. O.C.G.A. §§ 21-5-41(a), (k); *see also* Ga. Gov't Transparency & Campaign Fin. Comm'n, *Contribution Limits*, Ga. Georgia State Ethics Commission (Mar. 27, 2023).[1]

The Act also creates several types of committees, including campaign committees, independent committees, political action committees ("PACs"), and leadership committees. A campaign committee is "the candidate, person, or committee which accepts contributions or makes expenditures designed to bring about the nomination or election

[1] Available at https://ethics.ga.gov/contribution-limits.

of an individual to any elected office." O.C.G.A. § 21-5-3(2). Campaign committees are subject to the contribution limitations of Code Section 21-5-41(a).

An independent committee is "any committee" that is not "a campaign committee, political party, or political action committee," that "receives donations during a calendar year from persons who are members or supporters of the committee" and "expends such funds either for the purpose of affecting the outcome of an election for any elected office or to advocate the election or defeat of any particular candidate." O.C.G.A. § 21-5-3(15). Independent committees cannot coordinate expenditures with an individual candidate or his campaign committee, as any coordinated expenditure "is considered a contribution which is subject to limits." Ga. Comp. R. & Regs, R. 189-6-.04 (2015). However, independent committees can raise and spend unlimited funds to influence Georgia elections if they do not coordinate their expenditures with a candidate or a candidate's committee. *Cf. id.*; O.C.G.A. §§ 21-5-3(15), 21-5-34(a)(1)(B). Independent committees need not even make any disclosures if they avoid explicitly seeking to affect the outcome of an

election or do not explicitly advocate for the election or defeat of particular candidates. *See* O.C.G.A. § 21-5-34(a)(1)(B).

A "political action committee," or "PAC," is an organization that "receives donations aggregating in excess of $1,000.00 during a calendar year from persons who are members or supporters of the committee and which distributes these funds as contributions to one or more campaign committees of candidates for public office[,]" and is subject to Code Section 21-4-41's contribution limits. *Id.* § 21-5-30.1(4). Notably, PACs and independent committees are forbidden from coordinating expenditures with candidates for political office and cannot accept donations made to "bring about the nomination or election of any candidate for any office[.]" *Id.* § 21-5-30(a). Contributions and expenditures meant to advance specific candidates may only be made and accepted "directly to or by a candidate or such candidate's campaign committee[.]" *Id.*

In 2015, the State Ethics Commission ("the Commission") issued an advisory opinion that permits single entities to register as both independent committees and PACs, so long as the committee maintains separate accounting. *See* State Ethics Comm'n, Advisory Op. No. 2015-

02 (June 17, 2015).[2] Entities registered as both are referred to as "hybrid PACs." Unlike other types of committees, hybrid PACs are not required to have a chairperson, *compare* O.C.G.A. § 21-5-34.2(a*) with id.* § 21-5-3(15), there is no limit on the number of committees organized by the same group of supporters, and if they are not engaging in direct electioneering communication in an election cycle, they can avoid disclosures. *Id.* §§ 21-5-3(15); 21-5-34(a)(1)(B).

In 2021, the General Assembly amended the Act to authorize the formation of leadership committees. O.C.G.A. § 21-5-34.2(a). ("LC Statute"). Leadership committees are limited in number. *Id.* One is chaired by the Governor, one by the Lieutenant Governor, and one by each political party nominee for Governor and Lieutenant Governor. *Id.* The majority and minority caucuses in both the Georgia House and Senate may also establish leadership committees. *Id.*

Leadership committees may accept contributions year-round and raise and spend funds to "affect[] the outcome of any election[,]" "advocat[e] for the election or defeat of any candidate," and "defray ordinary and necessary expenses incurred" by a public officer's

---

[2] Available at https://ethics.ga.gov/advisory-opinion-no-2015-02/.

fulfillment or retention of office. *Id.* § 21-5-34.2(d). In this way, leadership committees more closely resemble traditional party organizations than candidate-specific campaign committees. *Cf. id.* § 21-5-41(j). Notably, like party organizations, leadership committees are not subject to the same contribution limits as campaign committees, *compare id.* § 21-5-3(2) *with id.* § 21-5-34.2(e), and leadership committees have increased transparency, reporting,[3] and disclosure requirements,[4] such as a requirement to register each transaction over $500.00 with the Commission within ten days of receipt. *Id.* § 21-5-34.2(e). The statute also does not prohibit the Governor and Lieutenant Governor from maintaining leadership committees during a primary election. *Id.*

**B. The present litigation.**

SAGA is a hybrid PAC chaired by Republican gubernatorial candidate and current Secretary of State, Brad Raffensperger. Compl., Doc. 1 at ¶¶ 3, 22. Lieutenant Governor Burt Jones is also a candidate for governor and chairs WBJ Leadership Committee, Inc. ("WBJ"), a duly

---

[3] *Compare* O.C.G.A. § 21-5-34(f)(1) *with id.* § 21-5-34(c).

[4] *Compare* O.C.G.A. § 21-5-34(f)(2) *with id.* § 21-5-34(b) per *id.* § 21-5-34.2(e).

registered as a leadership committee with the Commission. Compl., Doc. 1 at ¶ 23-24.

On December 8, 2025, SAGA filed this suit against the members of the Commission and Attorney General Chris Carr, alleging that Section 21-5-30(a)'s coordination ban and Section 21-5-41's contribution limits, as applied, violate its First Amendment right to free speech because WBJ is not subject to the same limits that SAGA is in support of Mr. Raffensperger's campaign. Compl., Doc. 1 at 11–13.; *id.* at ¶ 44. SAGA also sought an injunction prohibiting the enforcement of contribution and coordination limits against it. Mot. for Prelim. Inj., Doc. 2.

The court denied this request in an order issued on January 27, 2026, on the grounds that SAGA "ha[d] not met its burden of establishing a substantial likelihood of success on the merits of its claim." Order, Doc. 20 at 16. On January 29, 2026, SAGA filed an emergency motion for injunction pending appeal, Doc. 24, which the court likewise denied on February 2, 2026, because SAGA "provide[d] no persuasive reason for the Court to reconsider its decision[.]" Order, Doc. 25 at 2.

### C. Standard of review.

To obtain a preliminary injunction, a plaintiff bears the "burden of persuasion" to establish (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless the district court enters an injunction; (3) its threatened injury outweighs whatever damage the injunction will cause the defendant; and (4) the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

On appeal, this Court reviews a district court's denial of a preliminary injunction for abuse of discretion. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). "A district court abuses its discretion when its factual findings are clearly erroneous, when it follows improper procedures, when it applies the incorrect legal standard, or when it applies the law in an unreasonable or incorrect manner." *Id.* As the name suggests, "the abuse-of-discretion standard 'allows a range of choices for the district court, so long as any choice made by the court does not constitute a clear error of judgment.'" *Id.* at 1247–

48 (quoting *Collegiate Licensing Co. v. Am. Cas. Co. of Reading, Pa.*, 713 F.3d 71, 77 (11th Cir. 2013)). Appellate review of district court's preliminary injunction decision "is exceedingly narrow because of the expedited nature of the proceedings in the district court." *Id.* at 1248 (citing *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005)).

## SUMMARY OF ARGUMENT

SAGA is not entitled to the extraordinary remedy of a preliminary injunction, and the district court did not abuse its discretion in denying that relief. To prevail in this interlocutory appeal, SAGA must show both that it satisfied all four prerequisites for a preliminary injunction and that the district court erred in concluding SAGA was not substantially likely to succeed on the merits of its First Amendment claim. SAGA cannot make either showing.

First, SAGA has no substantial likelihood of success on its First Amendment claim. Under *Buckley v. Valeo*, 424. U.S. 1, 20 (1976), and its progeny, contribution limits and coordination restrictions impose only a marginal burden on speech and are thus subject only to intermediate scrutiny. The limits are constitutional so long as they are closely drawn

to serve the important interest in preventing corruption and its appearance. Georgia's contribution and coordination limits do exactly that: they cap direct and coordinated support to candidates while allowing entities like SAGA, an independent committee, to engage in unlimited independent spending. As other circuits have held in analogous cases, such limits are a valid means of preventing "manifest opportunities for corruption." *Proft v. Raoul*, 944 F.3d 686, 691 (7th Cir. 2019).

Second, SAGA's claimed injury and requested remedy do not match. SAGA identifies the LC Statute as the source of its alleged constitutional harm, yet it chose not to challenge that statute or seek to enjoin any leadership committee's activities. Mot. for Prelim. Inj., Doc. 2-1 at 2. Instead, it asked the court to enjoin only the generally applicable contribution and coordination provisions as applied to SAGA. *Id.* at 14. The district court correctly deemed that request "incongruous" because it would effectively rewrite the LC Statute and elevate SAGA to leadership committee status without curing the supposed structural inequality. Order, Doc. 20 at 13. That merits determination clearly withstands abuse of discretion review.

Finally, SAGA has not shown irreparable harm or that the balance of equities and the public interest favor an injunction. The challenged provisions do not directly suppress SAGA's speech; they impose only incidental limits on coordination, leaving SAGA free to speak independently. SAGA offers no concrete evidence of imminent injury. Enjoining Georgia's duly enacted campaign finance laws on this record would needlessly disrupt the State's anticorruption regime and election administration. Accordingly, the Court should affirm the denial of a preliminary injunction.

## ARGUMENT

To succeed in this interlocutory appeal, SAGA must show that it satisfied all four prerequisites for obtaining a preliminary injunction below and that the district court abused its discretion by holding that SAGA was not substantially likely to succeed on the merits of its First-Amendment claim. SAGA fails to do either.

## I. SAGA has not established a substantial likelihood of success on the merits of its First Amendment claim.

### A. Contribution and coordination limits are subject to intermediate scrutiny and must be closely drawn to serve the State's compelling anticorruption interests.

Limitations on contributions are fundamentally different than restrictions on political expression. Caps on what an individual or group may give to a candidate or political committee "entail[] only a marginal restriction upon the contributor's ability to engage in free communication" because they "permit[] the symbolic expression of support evidenced by a contribution but [do] not in any way infringe the contributor's freedom to discuss candidates and issues." *Buckley*, 424 U.S. at 20–21. Any resulting political expression is "speech by someone other than the contributor." *Id.* at 21. For the same reason, coordinated expenditures may be treated as contributions: they are "as useful to the candidate as cash" and such "'disguised contributions' might be given 'as a quid pro quo for improper commitments from the candidate[.]'" *FEC v. Colo. Repub. Fed. Campaign Comm'n*, 533 U.S. 431, 446 (2001) (quoting *Buckley*, 424 U.S. at 47.)) Accordingly, the Court applies the same intermediate scrutiny to limits on coordinated expenditures "as it applied to limits on [] cash contributions." *Id.*

Under the intermediate scrutiny standard, the state must show that "the limit [is] closely drawn to match a sufficiently important interest." *Nixon v. Shrink Mo. Gov. PAC*, 528 U.S. 377, 387–88 (2000) (quoting *Buckley*, 424 U.S. at 25) (cleaned up). The Court has recognized only one interest "sufficient to justify campaign finance restrictions" under this closely drawn standard: "preventing corruption or the appearance of corruption." *FEC v. Nat'l Conservative PAC*, 470 U.S. 480, 496–97 (1985) (citations omitted). "The hallmark of corruption is the financial *quid pro quo*: dollars for political favors." *Id.* at 497.

Applying these principles, the Seventh Circuit in *Proft v. Raoul*, 944 F.3d 686 (7th Cir. 2019), upheld Illinois's contribution and coordination limits and affirmed the denial of a preliminary injunction. There, Illinois Liberty PAC, an independent expenditure committee, argued that coordinated spending and contribution bans violated the First Amendment once contribution caps were lifted for other actors. *Id.* at 688–91. The Court rejected that claim, holding that prohibiting contributions and coordinated expenditures by such committees furthered the important interest in preventing actual or apparent corruption while leaving those entities free to engage in independent

advocacy. *Id.* at 691–93. Relaxing those bans, the Court explained, would allow independent committees to funnel "unlimited contributions from any source" to candidates, thus creating "manifest opportunities for corruption." *Id.* at 691 (citation omitted) (citing *Buckley*, 424 U.S. at 46). Because the law targeted "the activities most likely to give rise to the prospect of corruption," *id.*, and prevented committees from serving as conduits for corrupt funds, the Court held that it served a sufficiently important anticorruption interest and was "closely drawn" to that end. *Id.* at 691–93.

Similarly, in *Upstate Jobs Party v. Kosinski*, 106 F.4th 232, 238 (2d Cir. 2024), the Second Circuit upheld New York provisions that limited independent bodies, as compared to political parties, in the size of contributions they could receive and the funds they could transfer to candidates, and that reserved a "housekeeping account" exception—allowing unlimited contributions for non-express advocacy activities—only to parties. The Court held these distinctions were "supported by a substantial anticorruption objective and are closely drawn to serve that goal," noting that parties typically field numerous candidates, which "diffuse[s] the corruptive potential or appearance of any large

contribution," whereas independent bodies "typically serve as the alter ego of a single candidate or small group of candidates." *Id.* at 239, 251. The State thus had a legitimate concern where "small, closely held independent bodies running as few as one candidate" could receive six-figure contributions. *Id.*

### B. SAGA fails to assert a meritorious First Amendment claim.

SAGA has failed to establish that it is likely to succeed on its First Amendment claim for two reasons. First, as the district court correctly held, the remedy SAGA seeks is incongruous with the harm it alleges. *See* Order, Doc. 20 at 13. Rather than asking the Court to enjoin the Commission from enforcing the LC Statute or to address the underlying activities giving rise to its alleged First Amendment injury, SAGA moved for a preliminary injunction prohibiting enforcement of the generally applicable contribution and coordination provisions as applied to it. *See generally* Mot. for Prelim. Inj., Doc. 2.

The Court properly characterized SAGA's request to enjoin only the coordination and contribution provisions as an "incongruous" remedy that would effectively rewrite the LC Statute and, in substance, elevate SAGA to leadership committee status without curing the underlying

alleged structural inequality SAGA challenges. Order, Doc. 20 at 13–15. Because enjoining those separate provisions would not address the alleged First Amendment harm created by the LC Statute, the Court reasonably concluded that SAGA failed to show a substantial likelihood of success on the merits, a dispositive deficiency warranting denial of its motion for a preliminary injunction. *Id.* at 15. That merits determination falls well within the Court's discretion in weighing the preliminary injunction factors and, under the deferential abuse of discretion standard, provides no basis for reversal.

Second, SAGA is unlikely to succeed because the Act's campaign and coordination limits pass intermediate scrutiny. The contribution and coordination limits in Code Sections 21-5-41 and 21-5-30(a) are "closely drawn" to advance the "sufficiently important interest" in preventing corruption and the appearance of corruption. *Buckley*, 424 U.S. at 16. Regulating contributions and coordinated expenditures imposes only a minimal burden on speech, and so long as such regulations target "the most blatant and specific attempts at corruption without curtailing wide swaths of other speech," they are presumptively valid even if "unskillful[ly] tailor[ed]." *Id.* at 28; *see also Colo. Republican Fed.*

*Campaign Comm'n*, 533 U.S. at n.26 (citing *id.*); *Proft*, 944 F.3d at 693. The contribution and coordination limits at issue do just that: they cap the direct contributions and coordinated expenditures that hybrid PACs may provide to candidates and campaign committees, thereby preventing the large candidate directed contributions that "would create manifest opportunities for corruption." *Proft*, 944 F.3d at 693 (citing *Buckley*, 424 U.S. at 46). Absent these limits, hybrid PACs like SAGA could deploy "unlimited contributions from any source to contribute unlimited sums of money to candidates and to coordinate unlimited spending with candidates." *Id.* at 691 (citation omitted).

The anticorruption concerns at issue here are acute. SAGA seeks to make unlimited contributions and engage in unlimited coordination with current Secretary of State Brad Raffensperger in support of his gubernatorial campaign. Compl., Doc. 1 at ¶¶ 31–32, 44; Mot. for Prelim. Inj., Doc. 2-1 at 11–12. Georgia law, however, bars elected executive officers from accepting contributions from entities they regulate and likewise prohibits those regulated entities from contributing to such officers or their campaign committees or making contributions on their

behalf. O.C.G.A. §§ 21-5-30.1(b)–(c).[5] As Secretary of State, Mr. Raffensperger exercises broad regulatory authority over at least twenty licensed professions.[6] Enjoining Code Sections 21-5-41 and 21-5-30(a) would, at a minimum, create the appearance of *quid pro quo* corruption by allowing regulated entities to contribute funds to SAGA, which openly supports Mr. Raffensperger's candidacy. That appearance would persist even if SAGA did not ultimately spend those funds directly on his campaign.

### C. SAGA's arguments to the contrary are unavailing.

All of SAGA's arguments supporting its entitlement to a preliminary injunction suffer from a fatal flaw: SAGA incorrectly assumes that the district court "found" an underlying constitutional violation. Throughout its opening brief, SAGA asserts that the district court held that "the

---

[5] The Lieutenant Governor's office does not have any registration or other oversight over the regulation of professions or professional licensing.

[6] Three professions must directly register with the Secretary of State. O.C.G.A. §§ 43-20A-4 (immigration assistance providers), 43-46A-2(a) (trauma scene waste management practitioners), 43-4A-5 (athlete agents). The Secretary of State further oversees a professional licensing boards division of his office that licenses at least 22 other professions. *Id.* § 43-1-2; *see also* Homepage, *Licensing Division*, Secretary of State's Office, available at https://sos.ga.gov/licensing-division-georgia-secretary-states-office (listing licensing boards overseen by the Licensing Division).

challenged regulatory regime 'is likely unconstitutional.'" *See*, *e.g.*, Appellant's Br. at 1, 2, 11, 15. That is not what the court held. The district court merely noted that the LC Statute is "likely unconstitutional" based on the separate preliminary injunction analysis in *Perdue v. Kemp*, 584 F. Supp. 3d 1310 (N.D.Ga. 2022); it made no new findings and did not independently adjudicate the constitutional merits of the LC Statute here. *See* Order, Doc. 20 at 13–15. That approach was correct, because the "challenged regulatory regime" at issue in this case consists only of the contribution and coordination limits—not the LC Statute itself. *See supra* § I.B. As the court emphasized, "SAG[A] does not ask the Court to strike the LC Statute as unconstitutional or, as in Perdue, enjoin WBJ's unlimited expenditures in coordination with the Jones campaign." Order, Doc. 20 at 13. This disconnect between the alleged constitutional harm and the provisions SAGA actually challenges was central to the court's denial of relief.

SAGA's reliance on the district court's observation that "Defendants did not even defend the disparity in the regulatory regime on the merits" fares no better. Appellant's Br. at 15 (citing Order, Doc. 20 at 15 n.7). The court had no need for merits briefing on the constitutionality of the LC

Statute—and appropriately undertook no such analysis—because that statute is not actually before the court in SAGA's claim.

#### 1. SAGA incorrectly focuses on the scope of relief it sought below while ignoring the mismatch between the purpose of an injunction and the sweeping relief it requested.

SAGA insists it asked the district court for an appropriately narrow injunction and that any effect on anyone besides SAGA is incidental. Appellant's Br. at 17-20. In fact, the district court determined that "[a]llowing Plaintiff to operate unencumbered by coordination and contribution limits would 'require [the] Court to effectively rewrite the LC Statute' and, in essence, recognize Plaintiff as a leadership committee." Order, Doc. 20 at 14 (quoting *One Ga., Inc. v. Carr*, 699 F.Supp.3d 1291, 1336 (N.D.Ga. 2022)). That observation underscores that SAGA was not denied its requested relief because it "sought relief only for itself and did not request the injunction be extended to similarly situated non-parties," as it asserts. Appellant's Br. at 17. Rather, it demonstrates that SAGA sought judicially crafted legislation that would confer on it alone the functional privileges of a leadership committee, regardless of the statutory framework crafted by the General Assembly.

Such a remedy would far exceed the court's equitable role and dramatically *expand*, rather than narrow, the scope of the injunction.

Moreover, contrary to SAGA's assertion, Appellant's Br. at 18, the Supreme Court's decision in *Trump v. Casa*, 606 U.S. 831, 852 (2025), has no bearing on the district court's ruling. In *Casa*, the Court distinguished "complete relief" from "universal relief" and explained that the relevant inquiry "is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to the plaintiffs before the court." *Id.* (emphasis in original). But here, the district court correctly found that the injunction SAGA seeks "would not fix the harms caused by the unconstitutionality of the LC Statute." Order, Doc. 20 at 15. Because SAGA's requested injunction would not provide complete relief even to SAGA itself, the complete-versus-universal relief distinction is beside the point; the requested remedy is fundamentally inadequate and thus provides no basis for disturbing the denial of a preliminary injunction.

SAGA's reliance on *Carr v. WBJ Leadership Committee, Inc.*, No. 1:25-CV-04426, Doc. 22, Order (N.D.Ga. Aug. 28, 2025), is also misplaced.

SAGA suggests that the *Carr* court denied a preliminary injunction and dismissed the claim solely because the plaintiffs failed to join the proper parties. Appellant's Br. at 21. But the very paragraph SAGA cites tells a different story. There, the district court explained that the plaintiffs' decision not to challenge the constitutionality of the LC Statute itself broke the causal chain between their alleged injury and the conduct of the named defendants, creating traceability—and thus standing—problems. *Carr*, No. 1:25-CV-04426, Order at 15–16. In other words, the defect was not merely a technical joinder issue; it was that the plaintiffs' theory of harm rested on a statutory scheme they refused to place before the court. The same flaw pervades SAGA's case. By declining to attack the LC Statute while claiming injury from the disparities it creates, SAGA, like the *Carr* plaintiffs, fails to connect its alleged constitutional harm to the specific provisions it challenges, thus reinforcing the district court's conclusion that it is not entitled to preliminary injunctive relief.

Finally, SAGA tries to manufacture a "gotcha" by quoting from a brief filed by the State Defendants in a different case, *Jackson v. Jones*, No. 1:26-CV-00782, Doc. 46 at 7–8 (N.D. Ga. Feb. 25, 2026), to claim that the State Defendants "agree with Plaintiff." That is incorrect. The State

Defendants do not agree with SAGA, and nothing in the cited passage suggests otherwise. *Jackson* is materially different: there, the plaintiffs challenge only the LC Statute itself, not the separate contribution and coordination provisions. The point made in the *Jackson* brief is that if a plaintiff had a viable constitutional claim (and the State Defendants maintain none does), the plaintiff would need to challenge all operative provisions that allegedly work together to cause the constitutional injury, rather than selectively attacking only the LC Statute or only the contribution and coordination limits. Far from endorsing SAGA's position, the *Jackson* filing underscores the central defect in SAGA's case—SAGA seeks relief that maximizes a perceived political benefit to its preferred candidate, rather than relief that cures the purported harm. The State Defendants in *Jackson* brief are identifying the same defect; although the *Jackson* plaintiffs reach a different conclusion, they likewise seek relief that primarily advantages a chosen candidate, rather than that which narrowly addresses the alleged harm.

### 2. SAGA attempts to recast its argument as a challenge to the leadership committee statute, but that argument is waived.

SAGA now attempts to recast its case on appeal as if it had squarely challenged the LC Statute itself. *See* Appellant's Br. at 22–23. It did not. Any such attack is waived because it was never presented to, or ruled upon by, the district court. The Eleventh Circuit has made clear that "a circuit court's power to entertain an argument raised for the first time on appeal is not a jurisdictional one," but that the court may in its discretion consider a new argument only in "special circumstances." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004). Those "exceptional circumstances" are narrow—typically involving pure questions of law whose resolution is beyond doubt or issues of great public importance—and are not present here.[7]

---

[7] The Eleventh Circuit has permitted issues to be raised for the first time on appeal under five circumstances: (1) if it involves a pure question of law; (2) if the appellant raises an objection to an order which he had no opportunity to raise at the district court level; (3) if the interest of substantial justice is at stake; (4) if the proper resolution is beyond any doubt; and (5) if that issue presents significant questions of general impact or of great public concern. *Wright v. Hanna Steel Corp.*, 270 F.3d 1336, 1342 (11th Cir.2001).

Here, SAGA did not merely overlook a legal theory; it affirmatively structured its lawsuit to avoid challenging the LC Statute, while at the same time identifying that statute as the source of its alleged First Amendment injury. That is a deliberate litigation choice, not a technical omission. Under the "principle of party presentation," *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)), the parties "'frame the issues for decision', while the court serves as 'neutral arbiter of matters the parties present.'" In essence, "courts 'call balls and strikes'; they don't get a turn at bat." *Id.* (quoting *Lomax* v. *Ortiz-Marquez*, 590 U. S. ——, —— (2020)). Allowing SAGA to pivot on appeal and litigate a new challenge to the LC Statute for the first time would circumvent the district court's role and prejudice the State Defendants, who had no opportunity to build a record or fully brief that issue below. It also invites this Court to revise SAGA's complaint on its behalf. But if SAGA wishes to bring a direct constitutional challenge the LC Statute, the proper course is to amend its complaint and present that claim to the district court in the first instance—not to invite this Court to entertain a new theory on interlocutory review.

### 3. The caselaw SAGA relies on does not help it.

SAGA's reliance on *Davis v. Federal Election Commission*, 554 U.S. 724 (2008), and now *Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014), is misplaced. In *Davis*, the Court evaluated a statute that burdened "the exercise of the First Amendment right to use personal funds for campaign speech," 554 U.S. at 740, a context in which restrictions are subject to the more stringent "compelling state interest" test. *Id*. That line of authority governs expenditure limits on a candidate's own campaign spending—not contribution and coordination limits like those at issue here, which are subject to intermediate scrutiny. Likewise, as the Second Circuit has explained, *Riddle* is "inapposite" in this setting because the "plaintiffs here are the independent body and its leadership, not would-be contributors," whereas *Riddle* involved an Equal Protection challenge brought by contributors disadvantaged vis-à-vis similarly situated donors. *Upstate Jobs*, 106 F.4th at 248. The different plaintiffs and claims in *Riddle* yield a different doctrinal analysis that does not govern this First Amendment contribution and coordination challenge.

Instead, this Court should follow the more analogous reasoning of the Second and Seventh Circuits in holding that SAGA has not carried its burden of showing that the challenged statutes are "likely or probabl[y]" unconstitutional. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1292 (11th Cir. 2005). Enjoining Georgia's contribution and coordination limits would impermissibly undermine the State's substantial and repeatedly recognized interest in preventing corruption and the appearance of corruption, an interest that has long justified reasonable limits on campaign contributions. *See Colo. Republican Fed. Campaign Comm.*, 533 U.S. at 446; *Buckley*, 424 U.S. at 46; *Proft*, 944 F.3d at 693.

Halting the enforcement of statutes enacted by the people's elected, democratically accountable representatives is a serious step. *See*, *e.g.*, *Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663, 667 (11th Cir. 1984) ("Federal courts must be slow to declare state statutes unconstitutional."). This Court should not take that step here, as SAGA has again failed to advance any persuasive argument that would establish a likelihood of success on the merits, and there is no justification for enjoining two facially valid campaign finance statutes.

## II. SAGA has not shown a substantial risk of irreparable harm.[8]

SAGA does not articulate any viable First Amendment violation from which its alleged injury might arise, which is a necessary condition in a First Amendment challenge. *See supra* Sec. I.A. It alleges only a generalized chilling effect, not any concrete, particularized burden.

The "possibility" of irreparable harm is insufficient; rather, the plaintiff must "demonstrate that irreparable injury is likely in the absence" of relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 2 (2008). In the First Amendment context, a plaintiff's alleged injury fundamentally depends on the merits of its case. The mere "assertion of First Amendment rights does not automatically require a finding of irreparable injury." *See Siegel*, 234 F.3d at 1178 (citation omitted). Instead, a plaintiff must show a "*direct penalization*, as opposed to incidental inhibition, of First Amendment rights" to show irreparable injury. *Id.* (emphasis added). A direct penalty refers to government action

[8] Defendants address this Section to respond fulsomely to SAGA's Brief, but the Court does not need to reach the issues beyond success on the merits to resolve this appeal. *See Charles v. Burton*, 169 F.3d 1322, 1327 n.2 (11th Cir. 1999). The district court's order only addresses SAGA's likelihood of success on the merits; therefore, the Court does not need to address Sections II and III of SAGA's Brief.

that affirmatively suppresses speech or expression. *See, e.g.*, *KH Outdoor, LLC, v. City of Trussville*, 458 F.3d 1261, 1270 (11th Cir. 2006); *Fla. Preborn Rescue, Inc., v. City of Clearwater*, 161 F.4th 732, 746 (11th Cir. 2025).

SAGA glosses over the "direct penalization" requirement and instead contends that "[i]n a First Amendment case, a plaintiff's injury is irreparable per se." Appellant's Br. at 25. But this assertion is flatly contradicted by case law. *See Siegel*, 234 F.3d at 1175; *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *Cunningham v. Adams*, 808 F.2d 815, 821–22 (11th Cir. 1987). The challenged statutes here only incidentally inhibit coordination to prevent actual or apparent *quid pro quo* corruption. *Nat'l Conservative PAC*, 470 U.S. at 496–97. SAGA does not, nor could it, contend that the challenged statutes directly penalize or suppress its speech because, as an independent committee, it may raise and spend unlimited funds in support of Mr. Raffensperger so long as it does not coordinate with him or his campaign committee. Accordingly, SAGA is not presumptively injured by the coordination and contribution limits.

SAGA cannot prove it is harmed by leadership committees, as it failed to introduce any evidence to support its theory of irreparable injury. Moreover, SAGA assumes that leadership committees exist for the sole purpose of supporting its chair's campaign efforts; in fact, they exist to provide a vehicle for party leaders to build coalitions, engage in sustained issue advocacy, and advance policy priorities. *See* O.C.G.A. § 21-5-34.2(d). SAGA attempts to argue that disparity is innately created between leadership committees and hybrid PACs based on how SAGA is attempting to engage in the political process. But SAGA must show that it is entitled to the same function and operation of a leadership committee, and then it must establish how the coordination and contribution limits curtail its speech. It does not establish either.

Additionally, SAGA fails to prove how the contribution and coordination statutes restrict its speech. It has not provided evidence that any committee, much less WBJ, is engaging in political speech against SAGA or Mr. Raffensperger. Instead, it assumes as fact two unstated and unproven premises: (1) WBJ is spending money to promote Mr. Jones in the 2026 gubernatorial primary election, and (2) Mr. Raffensperger is not coordinating with a leadership committee. But an assumption is not

sufficient to evidence harm; rather, "proof of irreparable injury is an indispensable prerequisite[.]" *Siegel*, 234 F.3d at 1179.

SAGA improperly conflates direct penalization of speech with incidental burdens that the Supreme Court has long recognized as constitutionally permissible. The Supreme Court has expressly characterized campaign contribution and coordination limits as imposing only a marginal, incidental restriction on speech. *See Colo. Republican Fed. Campaign Comm.*, 533 U.S. at 446. Accordingly, mere exposure to contribution and coordination limits does not, by itself, establish that SAGA suffers per se irreparable injury.

### III. SAGA's requested relief would harm the public interest by creating the appearance of corruption.

The balance of harms and the public interest also weight against SAGA. The State "indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted). Consistent with that interest, the State restricts coordination between candidates and independent committees to guard against *quid pro quo* corruption, the appearance of such corruption, and the undue influence of large donors on elected officials. Granting SAGA's requested relief, however, would effectively authorize

"unlimited contributions from any source to contribute unlimited sums of money to [the] candidate[] and to coordinate unlimited spending" with Mr. Raffensperger, thereby creating "manifest opportunities for corruption." *Proft*, 944 F.3d at 691 (citing *Buckley*, 424 U.S. at 46).

Leadership committees, by contrast, are quasi-party entities whose purposes extend well beyond any single candidate's campaign. They serve as institutional vehicles for party leaders to articulate policy priorities, build and maintain coalitions, and engage in sustained issue advocacy. *See* O.C.G.A. § 21-5-34.2(d). They may support candidates up and down the ticket who share common principles and goals. *Id.* In this respect, they more closely resemble traditional party organizations than candidate-specific committees. *See* O.C.G.A. § 21-5-41(j).

Because leadership committees diffuse political support across multiple races, issues, and cycles, they do not present the same concentrated *quid pro quo* risks as candidate-specific vehicles. Indeed, the General Assembly created leadership committees in response to concerns about dark money and to enhance transparency in the State's electoral process. *See Jackson v. Jones*, No. 1:26-CV-00782, Doc. 65, Hr'g on Pls.' Mot. for Prelim. Inj. at 40:17–20 ("Comparing campaigns in 2018

to 2022, Georgia saw a substantial, nearly 80 percent reduction in money spent from dark-money committees because of the creation of this statute.”). Leadership committees thus advance the public interest and deter actual or apparent corruption by “exposing large contributions and expenditures to the light of publicity.” *Buckley*, 424 U.S. at 67.

SAGA, by contrast, focuses solely on the supposed benefit to itself and to other unidentified campaigns, asserting that “similarly situated campaigns and candidates will have this injunction to rely upon if Defendants attempt to enforce the enjoined laws against them.” Appellant’s Br. at 27. Hypothetical future challenges are speculative. SAGA also ignores the practical consequences of enjoining Georgia’s campaign finance limits in the midst of a contested gubernatorial primary. The State would be forced, mere weeks before the primary, to administer an entirely new committee type and recalibrate its campaign finance system mid-cycle. That disruption would sow confusion among candidates, regulators, and voters and would likely persist through the 2026 gubernatorial election. Overturning the lower court’s decision would thus substantially harm the State, burden third parties, and disserve the public interest.

## CONCLUSION

For the above reasons, this Court should affirm the district court's order denying SAGA's motion for an emergency preliminary injunction.

Respectfully submitted this 2nd day of April, 2026.

/s/ *David B. Dove*
David B. Dove
Elizabeth Hicks
Alexander Balser
Rachel D. Hendrix

TROUTMAN PEPPER
LOCKE, LLP
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30308
(404) 885-3000
david.dove@troutman.com
betsy.hicks@troutman.com
alex.balser@troutman.com
rachel.hendrix@troutman.com

*Counsel for State of Georgia*
*Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,225 words, excluding the parts of the response exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word in Century Schoolbook 14-point font.

April 2, 2026

/s/ *David B. Dove*
David B. Dove
Georgia Bar No. 998664

*Counsel for State of Georgia Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on April 2, 2026. I served all counsel of record by CM/ECF.

April 2, 2026

/s/ *David B. Dove*
David B. Dove
Georgia Bar No. 998664

*Counsel for State of Georgia Defendants-Appellees*